Well, good morning, Your Honor. May it please the Court, my name is Howard Shanker. I'm representing the Save the Peaks Coalition and the other plaintiffs in this case. I would like to reserve five minutes for a bow. Watch your time. Yes, Your Honor. In this case, the federal government and Snowbowl, a private ski area on federal land, want to take water from the Rio de Flares Wastewater Treatment Plant. It's treated water. It's treated to Arizona A or A-plus standards. There are no federal standards. But they want to take this water and they want to spray it on the mountains to make snow for our children and grandchildren to play in. Now, we know that this is not potable water. How do you know that? Well, it says so in the Environmental Impact Statement, and I'm happy to direct your attention to it. But they're also required post-signs saying don't eat the snow. It's made from non-potable water. We know that this water contains what are called pharmaceuticals and personal care products, things that don't get tested for, treated out, things like caffeine. You know, this is tremendously interesting. But unfortunately, we have three non-experts here. We probably don't even ski. And so in the process, we have this record, and the government has gone to some extent of checking of whether or not this meets a statute. So the question is, did they obey the rules that they're supposed to follow? And regardless what's in the snow, you know, it's an issue of whether or not they did what they were supposed to do according to the statute. That's all the control we have. Whether I particularly would want to eat the snow or not is not the issue. The issue is whether or not they went through the process properly. And I take it you believe they did not. That's exactly right, Your Honor. Okay. And could you tell me why? Well, if you go back to 2002, the very beginning of the NEPA process, the Forest Service came out with what it called strategic talking points. And in those talking points, they said that the objective was to, quote, anticipate perceptions and accusations critical of the snowball proposal and to create messages to explain the Forest Service point of view. Be that as it may, let's jump forward in time because there's so much documentation here. In the February 2005 final environmental impact statement, which of course dealt with your previous case, they indicated they considered and responded to concerns about the issues that you raised. They responded to extensive comments. I believe you were involved in drafting a number of those comments on the draft environmental impact statement, evaluated the same concerns. And by 2005, your previous group and you as counsel were certainly fully on notice of the concerns, of the Forest Service's proposed disposition of your concerns. Is that a fair statement? I believe so. Okay. So as of 2005, let's assume they had said what they were saying about the meeting of the standard. You say, I absolutely disagree. You came up with a lot of scientific and other evidence. You raised the issues and concerns of your Native American clients, their concerns. They then came back with a response. Under the APA, what more does the government have to do? And under NEPA, what more does the government have to do? More importantly in this case. Under NEPA, and what's really at issue here, is an EIS must include a reasonably thorough discussion of the significant aspects of the probable environmental consequences. But the first issue here under NEPA is that the EIS at issue does not include a reasonably thorough discussion of the impacts associated with the ingestion of snow made from reclaimed snow. Now, who decides that? Let me just say, and I think Judge Wallace is correct, none of us is a scientist as far as I know. But I've read the record. There's just all kinds of discussion back and forth. From the government's perspective, and certainly as a lay person looking at this, it looks to me like they really did discuss this, and you really did discuss this, and you just disagree. You just disagree. You will never agree on this. And you get back to Judge Wallace's point. What does the law require? What more under NEPA in this particular portion of the case? Your Honor, that's what the law requires. A reasonably thorough discussion of this impact. So is that the end of the case then? Does the government prevail? No, Your Honor, because the EIS does not include one. In fact, in the lower court, Snowball argued that the EIS contributed or provided 120 pages, was dedicated to the discussion of ingestion. The Forest Service argued that 50 pages in two places of the EIS was dedicated to this discussion. Well, whichever one is right, the reality is it was discussed, right? Well, no, Your Honor. The reality is if defense counsel with the gift of hindsight can't figure out where this discussion is, how is the public supposed to find it in this meant-for-public document? The lower court went on to find that this discussion exists in five paragraphs in the response to comment section. So the problem with that is on their face. They're not a reasonably thorough discussion, and that has to be determined on a case-by-case basis. But they're largely dedicated to a discussion of signage. I mean, what I would like to point out, and I'm sure you're aware of it, is in Navajo Nation 1 at 479F. Wait a minute. Wait a minute. You're doing this again. Navajo Nation 1, are you talking about our case that was overturned or the en banc case? No, the case that was vacated, Your Honor. The vacated case, you can't cite that case. The vacated case cannot be cited. There's a specific order to the effect that you cannot cite it. It doesn't exist. It doesn't exist anymore. So don't cite that to us. The order says that it shall not be cited as precedent under Federal Rule of Appellate Procedure 32.1a. It says a court may not permit or restrict the citation of Federal judicial opinions that have been designated as non-precedential, non-precedent, or the like and issued on or after January 1, 2007. Let me read. You're talking about our non-published opinion. That's different. What this says, a specific order in this case, which is published at 506 Fed 3rd 717, says the three-judge panel opinion shall not be cited as precedent by this or to this court or any district court of the Ninth Circuit except to the extent adopted by the en banc court. Now, you didn't – this portion dealing with the ingestion was not talked about by the en banc court. It wasn't ruled upon. Well, Your Honor, the en banc court vacated it on a technicality. But I'm not citing it as precedent. Don't vacate it. I'm just making sure you understand that it's there. Well, at least from my perspective, when I say this respectfully, unless you can show me otherwise, the vacated three-judge panel opinion that was vacated when our court took it on en banc doesn't exist. You can't cite it. We can't rely upon it. I don't know whether my colleagues agree, but that's certainly my understanding. I understand, Your Honor. I would again just like to point out FRAP 32.1. But this is a specific order of the court. I understand. And I'm not citing it to you as precedential. I'm just citing it to you as a precedent. Well, reasoning whatever. Well, since the case has come up, the real question for me is why you are not barred by matches. And I think you ought to say where we even get to your merits argument. You had the chance, you and some of the same people had the chance four years ago, and you didn't push the issue. You waived it. Why aren't you barred? Your Honor, latches, as you're aware, this Court reviews latches for an abuse of discretion. That's generally whether it's an erroneous finding of fact or an erroneous application of law. In this case, both elements are present. First of all, in this case, both those elements are present. Why? She looked at your strategy. It was a strategic decision to hold back. When you could have put the same in, I don't see anything wrong with her decision. Well, Your Honor, there was no strategic decision. The three-judge panel had ruled in favor, had ruled on the merits of this and said that there was no reasonably thorough discussion included in the EIS. There's no strategic decision to hold back. What you have here are unrelated plaintiffs who filed a claim that has not been decided within the applicable statute of limitations. None of the plaintiffs are the same, are they, Your Honor? No, they're not, Your Honor. None of them? No, Your Honor. A couple are a member of the Navajo Nation, but that does not rise to the same level. What about the Sierra Club? The Sierra Club's not a party to this case. Are members? I think one of them was a member, but there are various plaintiffs in this case, and the Court looked at race judicata and determined that it did not apply. It isn't race judicata. It's latches. Well, latches, Your Honor. The same people, at least the same group, had the same opportunity four years ago and waited. To demonstrate latches, well, first of all, there's a strong presumption that latches does not apply when a case is filed within the applicable statute of limitations. And this case was filed within the applicable statute of limitations. There's also a doctrine that says that latches is strongly disfavored in environmental cases such as this one. Now, the lower court notes that doctrine but doesn't apply it here. I suppose the problem you have is the same one you've been thinking about, how you're going to handle before us in this argument. And that is that your clients knew exactly what was going on in the Apache Nation case, and they waited to get a second bite at the apple in case the first was lost. I mean, that's the argument the other side gives. So we then look at latches and say, look, if all the parties were together in the first case, we'd only have one case. So if there is prejudice in some fashion, then latches becomes an important issue. And what's your best argument of why latches doesn't rule your party out? Your Honor, to show latches, you've got to demonstrate first undue delay. And again, this was filed within the statute of limitations. But you also have to show that prejudice resulted. And in the latches context, prejudice means that the harm that plaintiffs are seeking to avert or stop is irreparable. Now, isn't that the real issue we have before us is the prejudice issue? And they're going to come back and say the same thing they did in the green brief at page 26 or wherever it was. Look, this cost us millions of dollars before. Now we have to spend millions of dollars again. And they're going to say that's their prejudice. What would be your response to that? Well, Your Honor, that's not really what we look at in terms of prejudice in the context of latches. We look at whether there's irreparable harm. And in this case, the case was filed over two years before the federal government even authorized the beginning of construction. The lower court found latches based on a finding that construction was largely complete. That's an erroneous finding of fact. That's an abusive finding. There's been no construction at all at this point, right? There's no construction at all. That's right. So you say that finding is clearly erroneous. Yes, Your Honor. But what about the determination, if there was any, of the cost that this organization has put up? Well, they could have filed the case once and tried it against two parties. Now they have to exacerbate that with the millions of dollars involved. That's their argument, and I'd like to know your response. There's a number of responses. First of all, just as a matter of basic jurisprudence, you can't preclude an unrelated plaintiff from filing a claim on an issue that hasn't been decided within the applicable statute of limitations. Well, latches is to take care of issues within the statute of limitations. If the statute of limitations had filed, you'd be out of court. Your Honor, the more direct answer would be that it's not the type of harm that's considered. If you look at Apache Survival 121F3rd at 913, or Preservation Coalition v. Pierce 667F2nd at 855, they say that delay may become prejudicial for purposes of latches if the harm appellants fear has become irreversible. And if you look at Apache Survival 121F3rd at 912, and I'll quote, they say prejudice must be measured by what Congress defines as prejudice. So the concern is whether the harm that Congress sought to prevent through the relevant statutory scheme is now irreversible. Thus, courts evaluating prejudice in analogous contexts have focused not solely on the amount of money spent in dollar terms on a project, but on the degree to which construction is complete. Not true to the issue here, is it not, as far as latches? It seems to me Judge Fletcher's cases suggest that if the construction has not begun, you can't meet the standard, but he seems to leave no quantum limitation on the amount of money that somebody loses. Is that your understanding as well? Well, that's what the case says, but I don't think that's the point here. They spent zero money on physical construction. I mean, when you're looking at this issue, it's well settled. I mean, this is Ninth Circuit precedent that the harm has to be irreversible and that the amount of money spent is not really determined. So basically, and again, I'm speaking for myself, let's assume for a moment that I get past the latches issue. I'm still back to the problem that, at least as I'm understanding your position, and, Anita, as I understand the cases, is that we as a court look at what the government said, what your previous folks said, the public said, the back and forth, back and forth, and the ultimate position and whether or not they reasonably and adequately discussed the issue that you have raised here. Is that correct? Yes, Your Honor. So that's it. Then ultimately, what I would appreciate your doing, and you're almost to your five minutes. I don't know how much you want to save on this, but I'm having some difficulty with the concept that this issue was not discussed and there was no resolution made. I do understand that you don't agree with it. I clearly understand that. Help me with how I'm supposed to figure out, from your perspective, who is correct, who bears the burden to show that it was not adequately considered. Clearly considered. Clearly considered. The question is adequacy, is it not? Well, I'm a little confused. So you mean the en banc court in Navajo Nation 1 clearly said that this issue was improperly raised in the district court. We're vacating this on a technicality. They didn't talk about this. There's nothing on the merits. They didn't talk about the snow ingestion issue. That's exactly what they were talking about. The three-judge panel decision. No, don't go there. I'm talking about the en banc. From my perspective, our court has not previously, in a case that is citable, dealt with the snow ingestion issue. The district court did. Am I wrong about that? Yes, Your Honor. The district court in the first round of cases did not deal with this issue either. Okay. What about the second round? In this case, of course, that's what this case is about. Exactly, yeah. So given that fact and given what the district court found, when I look at this and I see the back and forth and so on and the scientific information that they come up with, you disagree with it. Ultimately, are we not bound by, as long as there's a full discussion under NEPA, doesn't the government win on that? Well, Your Honor, if there's a full discussion. We're not debating the scientific elements of this.  But how do you measure what's full discussion, counsel? Does it have to be 400,000 pages? There are no pages. It's these five paragraphs in this response to counsel. Well, let's just say it is just five paragraphs. I disagree with you, but just say it is. And say they said, look, we've considered everything the public offered here. We've considered what the tribes have offered. And based upon the way they deal with the river or the way we deal with potable water, et cetera, et cetera, et cetera, this works for us. Isn't that enough? It's got to be a reasonably thorough discussion. The hypothetical is not clear, and I see I'm out of my time. Okay, you want to save time. Okay, fair enough. Let's hear from the government and the developer. Good morning, Your Honors, and may it please the Court. My name is Lane Spadden. I represent the United States Department of Agriculture Forest Service. And I will be sharing a few minutes of my time with counsel for the Intervenor Appellee Arizona Snowbowl Resort. These plaintiffs engaged in a delay tactic that is precisely that this Court projected in Apache Survival Coalition 2, where there was pending litigation, which is delaying the project. That litigation progressed for four and a half years, reached a final conclusion when Sir Chirari was denied by the Supreme Court, and only at that point did these plaintiffs come in to bring their particular NEPA claim, a claim which the District of Arizona had already ruled in February 2006 was improperly pled by the Navajo Nation, was untimely added to the case, and denied a motion to amend the complaint in that case. Let's say for the sake of argument that you've got a strong argument on the should-have-come-early argument. I think the stronger argument raised by your opponent is that this is not the type of prejudice that can bring laches to the forefront. And maybe you could focus and tell us why that's so, and to the extent you can, use nine circuit cases that exist. Your Honor, I think the best sources of that prejudice law are the Apache Survival Coalition cases, the first and second. Counsel suggests that Apache Survival Coalition 1 rules out the possibility that money spent on the delays resulting from litigation could ever amount to prejudice. But indeed, this Court did look to the money being spent, and did consider the increased cost, so that as a result of delays from the successive litigation, costs for that project were up to $11,000 a day. Let me understand something here. Do you agree, and maybe I need to ask the developer, do you agree that there has been no construction commenced on this project? No, Your Honor. I don't agree. Since this lawsuit has been filed, there has been some construction begun. How much? What are we talking about? Some portion of the water pipeline has been built. I'll have to let my fellow counsel answer the details. Okay. But, yes, it's begun. When this second lawsuit was filed in 2009, the party stipulated to further delays of construction, so there was a long period there, I think stretching into 2011, where there was no construction begun because this lawsuit was pending. At some point, that lifted and construction did begin. Okay, let's just hypothetical. Let's say that a million dollars has been spent. I have no idea. It might be less. It might be more. But say a million dollars has been spent. But the big project has not really gotten started yet at this point. Our case law seems pretty clear that litigation per se and the delays entailed by litigation per se in environmental matters are not sufficient to invoke latches. Do you agree with that? Those cases all are talking about the fact that federal agency approves a project, there are potential environmental impacts, one expects litigation. And the fact that you're having to go to court and subject yourself to judicial review is a fact of the process. They do not, however, rule out delays imposed by successive litigation. And I should point out these are somewhat rare circumstances, the case we're arguing before you. And latches is not a defense the government raises in most of these cases. But here we have depositions of each of the plaintiffs. We know full well that they were aware of the prior litigation and could have joined that litigation. And those are key facts that separate this case from your other. So you're saying that there's actually a new kind of latches case or a new kind of prejudice case, if you will. That is that if you do what these folks are alleged to have done, you've got their counsel, everybody's got a waiting around, they ultimately lose, then they bring this new follow-on lawsuit of all the same things they could have done before. You're saying that that is a different factual situation and therefore a prejudice that is distinguishable from the previous prejudice standards that we have. No, no. I'm saying it's the type of prejudice standard contemplated by this Court in the fifth footnote of Apache Survival Coalition 2 where the Court says the type of tactic where you wait for a project to be delayed and then the delay ends and you need to delay it further by filing successive lawsuit is at odds with the purpose of latches and is precisely the reason for the existence of the doctrine of latches. That fact alone, having to re-litigate and reappear in court on an agency action that has already been upheld, is itself prejudice irrespective of costs or money. But I guess my point is you're saying, I know you say this was referred to in footnote 5, but you don't have the exact circumstances in that case, right? That was just kind of a dick to come, right? It was a further explanation of the Court's reason why there was in fact prejudice in that case because, of course, there are cases that says you consider the construction, you consider money. None of these rule these things out as categorical. They all sort of are weighed by the courts, and that's why latches is reviewed for abuse of discretion. The weighing is to be done by the district court. But here, if you were writing this, I gather you would say the fact that there's been very limited construction and the fact that maybe you just had the delay based upon litigation is not enough to distinguish this from the current cases. Here you've got this follow-on situation where these people could have gone earlier and so on, and that in and of itself results in prejudice. Is that correct? That's right. That's prejudice in addition to the prejudice which Your Honor has described as insufficient but clearly does go towards. Well, I'm saying it's insufficient because that's what the cases seem to say. That's right. But you're saying this is a new class of prejudice for purposes of analyzing latches. It's a prejudice previously described by this Court. It's a prejudice finding. An exact prejudice finding like this has not been upheld by this Court, but neither has it been rejected. And I hesitate to describe this as a new class of cases or a new latches rule. That is very much not what we are pressing here. Well, latches is a matter of equity, basically. So in effect, it's all fact-based. And that's the only reason I mention it in that setting. Yes, Your Honor. And that's why I want to reiterate. We're talking about latches in the context of this case. We're not pressing for some new broad application of the latches doctrine by any stretch. So are there any other cases in which, other than the footnote 5 in the Apache case, where we have identified this as properly to be considered for prejudice in a latches case? Or is this all we have? I think that's the best case for that proposition, Your Honor. The other cases, I think, go towards this issue as well. When they talk about delay of going to court and waiting to go to court, cases like Ocean Advocates and even those cases where latches were not used, the Court said that there would be latches, except that there was some other extenuating circumstance there where there was negotiations or lobbying or some other nonjudicial avenue being pursued throughout that time period. That's obviously very different than the situation here. Footnote 5 is pretty close to what we have here. I agree. And if I might briefly also address the merits, pointing out, of course, that the district court, having ruled on either independent grounds, this Court can affirm either on latches or on the merits and need not reach both if it chooses not to. Do you have a preference? Your Honor, I think this is a strong case for latches. I think it's rather an extraordinary set of circumstances. So let's just say, again, this is all discussion just like I had with the other counsel. But let's just say hypothetically that we said, you know, we agree this is latches. This is going to get going to go much longer on and on and on and on and on because it's a procedural matter, whereas if you decide something on the merits, it's going to go faster. Again, I'm not tipping a hand as to which way it would go either way. I'm just discussing this. But from the government's perspective, doesn't it make more sense to just to not rely upon latches and go right to the merits if, indeed, the merits prevail? It would be nice to have some closure on the merits issue, Your Honor, yes. And we do believe that that's rather easily reached. The Peace Council repeatedly said that there were only five paragraphs in the final environmental impact statement that refer to these questions. Obviously, I hope the briefs both from the government and the SNOBEL suggest otherwise. The portion of the final EIS, the body of the final EIS that I direct your attention to, starts at SCR 273 and goes inclusively to 303. That's a 30-page range. It starts off the very first sentence by acknowledging that one of the primary concerns when you're talking about wastewater pretreated is that it can be ingested and ingestion causes some risks. It then describes wastewater treatment generally, wastewater treatment at the Rio de Flags specifically. And I would also suggest that in response to Judge Smith's prior question about the procedures here, this is actually a good example of NEPA working correctly. The draft EIS was published for public comment. There were a large number of public comments. If the Court looks at SCR, I believe, 316, it's the first comment sort of in this section. A commenter said in the draft EIS, there's still a lot we don't know about the chemical compounds in this water, about the organic compounds that can be found. A lot of this seems inconclusive. We really need more detail before we can read this environmental impact statement and understand the potential impacts. And the Forest Service's response to that comment is reflected in the body of the environmental impact statement. They tested the actual water from the Rio de Flags. The EIS contains table after table of precisely what is in the water. Not only does it assure you that it complies with all of the appropriate legal standards, the numeric criteria set by federal and state regulatory agencies, but also if there were any concern by the Save the Peats Coalition about a particular organic compound, a particular exposure, any particular study they would have liked us to read, any specificity they could have brought but did not bring, those tables would provide that information and the environmental impact statement would respond. Instead you have what this court has in previous cases referred to as flyspecking, the repeated argument that there should be more information without suggesting what more information there might be. Here you have the Forest Service doing an international survey of the available literature, explaining what that literature suggests. It talks about exactly what happens when you freeze the water, when you make snow out of the water, exactly what happens when you ingest the water as part of your municipal drinking water supply. There is no question that, to the extent that anyone can know, what potential environmental impacts there were from this project, they are described to the best of the agency's abilities. So I gather from your perspective, under any standard, there was a hard look undertaken. Absolutely. And that under Lands Council, we're not scientists, as long as the agency and its experts make a value determination to fairly address these issues, the fact that the parties disagree is not conclusive. The government then, in that case, has met its burdens underneath us. I agree. I'm not saying that's what I believe. I'm just asking if that's your position. I'm saying it is what I believe, absolutely. And that especially goes to sort of the follow-on related claims about scientific integrity and providing high-quality scientific information to the public, all of which are variations on the theme that the EIS doesn't consider this an issue enough. But the cases where this Court has held that those standards were not met are cases where the methodology was determined to be flawed, there was a critical study that was overlooked or omitted, there was some verifiable defect in the scientific process that underlied the agency's decision. None of that is here. If the argument is simply, we would like to know more, that is, of course, not the purpose of NEPA. The purpose of NEPA is to inform decision-making by disclosing everything that we do know and guiding the agency's decision-making accordingly. Anybody else have a question? I have one other question. The district court found that, save the peaks that it met in its claim, that the Forest Service had failed to provide, in quotes, high-quality environmental information. Is that the government's position as well? Yes, it is, Your Honor. And the argument is raised in the brief, but only to the extent that it is repeated. There is no authority cited for it or indication of what high-quality information should have been provided but wasn't. Okay. Unless you have your other counsel to take the rest of it. Okay. Very good. Thank you very much, Your Honor. Thank you. You know what the first question is going to be once you tell us your name, right? Yes, I do, Your Honor. But good morning. May it please the Court. My name is Kate Stetson. I represent the Snow Bowl. And I don't have much to add to Mr. McFadden's excellent presentation. In answer to your question, the current status of the project is that about half of the pipe has been put in. How much did it cost? The pipe cost in total, I think, at least $12 million to finance, including the rest of the physical plant. But more to the... To finance or that's actually been expended? Your Honor, I don't think the current expenditures are in the record, because, of course, as the district court knew and understood, and we'll get back to that in a moment, the construction, the actual groundbreaking was stayed for the most part during the entire course of this litigation. It wasn't until after the district judge issued her decision that that stay was lifted. Do you remember the date on that, counsel? The decision that she issued was December of 2010. The stay was lifted. Plaintiffs moved for an injunction pending appeal. The injunction was denied. Plaintiffs sought one from this court. The injunction was denied. And the actual construction began. But let me sort of sell that word construction for April of 2011. But here's the upshot of what we were discussing earlier with respect to whether the project or the construction is almost complete. Mr. Shanker referred to the district court talking about how construction was almost complete. That's, in fact, not what she said. If you look at Record Excerpt 25, which is the district court's decision, what the district court said is, among other things, defendant Snowbull had expended a great deal of resources on the Snowbull upgrade project before this action was filed. That's absolutely true. It spent several million dollars scoping and litigating this project starting in 2002. That's when this project began. The district court also understood, and you can see this at footnote 11 in our brief at page 35, the district court, of course, understood that construction, the actual groundbreaking, hadn't begun. Because she was the one who approved all of the steps, staying groundbreaking until this litigation was complete. So what the district court was talking about, and, again, as you recognize, we're here on an abuse of discretion review of the last decision, was that the project had been going on since 2002. That was the first time that the Snowbull went to the federal government and said, we'd like to implement a lot of the same improvements that the federal government already approved back in 1979 and were challenged and upheld under Wilson, and we'd like to start making snow, like over 80% of other ski areas do. That's when the project began, and we are this close to the finish line, and we're not there yet because of this follow-on litigation. Is that what the district judge meant by near completion? I think it is completely clear from the district court's decision that that's exactly what she meant. She says a great deal of resources on the Snowbull upgrade project before this action was filed, and the court knew, of course, that nothing had physically altered the landscape as of that point because the stipulations had been entered and extended that stayed any groundbreaking that Snowbull otherwise would have liked to do until this litigation ran its course. So near completion, ordinarily, you would see all sorts of apparatus going up the hill and the rest in, but you're saying that this has a different meaning that the district judge was using? I do. I think it has a different meaning. I think the judge understood it to have a different meaning. And, of course, as you, Judge Smith, were discussing with Mr. McFadden a moment ago, part of the nature of this particular case and the very unusual facts of this case, mirrored perhaps only by Apache's survival coalition, too, is that it's also the government, after all, who's prejudiced by this follow-on litigation. That was the argument that they made in their latches motion below, that the government now had to gear up and start expending its own resources again, not to mention the district courts, on the second litigation. Does the record show how much money was actually invested by the investors? I understand they have to go through a lot of engineering. They have to determine whether or not they can use artificial snow. They've got to go look at this and the rest of that. But does the record actually show the amount of money that was invested by that time? Yes. The declaration of Eric Borowski, which is in the supplemental excerpts of the record, describes- What page? I don't have the page number ready to hand, but I'll supply it momentarily- describes $1.2 million as having been spent just on the environmental scoping and another $3.5 million on defending the four consolidated lawsuits that were brought in 2005 all the way through 2009 when certiorari was sought. Now, help me with this. My understanding of our case law is that the cost of litigation per se and maybe some of the preparatory work does not qualify for prejudice purposes. Do you agree with that? Well, I do in a qualified way, and I think I take the same approach that Mr. McFadden did, which is if we're talking about the sort of mine run NEPA action, where the first plaintiff or set of plaintiffs or four consolidated cases come in and challenge, among other things, NEPA violations, it's not available to the government or to a private party to say, but this is going to cost us money if we have to do this NEPA review. But that's, of course, not this case. You know, this case is now we have a second wave of litigation. I understand. That's what I'm trying to segregate is because you've just given us the scoping, $1.2 million, but about $3 million in litigation costs. And I'm just saying that certainly the litigation costs we can't count. Right. I think what all of us are looking for is some evidence in the record that shows that after the first round began, apparently from like April or May, that there has been some significant expenditure made where something has actually been put in the ground or at least a lot of money has been spent. I think the government mentioned like half the pipeline has been completed. Maybe I misunderstood. Yes. That was also what I mentioned at the beginning of this argument. Half of the pipeline at this point is in the ground. And what did that cost? Is that in the record? I don't believe it's in the record because of the timing, of course, of that implementation. Right. As I mentioned earlier, the actual physical implementation of this part of the project was ---- Well, let me ask you this. Is it in the record what the projected cost of the total project was going to be when completed? I think in the Borowski Declaration, which you can find at Supplemental Excerpts of Record 104, what you can find, and again, given the timing of this declaration, which was November of 2009, I believe, what we're talking about is projections about financing costs. Right. And that's to find out whether we can work backwards, basically, is what I'm asking. Right. Based on the declaration, what was it going to cost? Obviously, there's inflation and all that other stuff. Yes. But what is it? It was a projection that it would cost $12 million in financing, financing that, of course, was difficult to come by given the tendency of the litigation. Okay. So from your perspective, is it fair to say that taking that declaration, that the financing would be $12 million, and maybe there's some equity in there as well, but just taking the financing alone, that if half of it's done, you're locking in roughly $6 million of in-ground expenditures. Is that a fair or a false statement? I think to the extent that we can evenly allocate the money, that's a fair statement. I hesitate to put too much weight on it, though, just given the timing of the record here. I understand. My co-counsel has just handed me, this is page 13 of the Borowski Declaration, paragraph 32. The estimated cost of the pipeline and snowmaking system together is approximately $12 to $14 million. Rising steel prices every year of delay adds a million onto that cost. And that delay, of course, adds another million onto that base cost per year. And that was done in, what, 2009 as a declaration? Is that correct? This declaration is November 27th, 2009. This is the SCR 104 site that I supplied. With your indulgence, let me briefly make just one point about the NEPA, discussion. And to begin with, you all recognize that this is an alternative ruling, independent. You can affirm it without having to get into a laches decision. NEPA, as this Court well knows, is a pragmatic obligation on the Court. You look at whether the discussion was reasonably thorough. You look at whether the public was able to participate, whether it was an informed decision. What you don't do is nitpick and flyspeck and sit as a scientific panel of experts or impose a different result on top of a considered result that the agency reached. I would point you, in addition to the record sites that Mr. McFadden supplied, which is SCR 273 to 302 inclusive, these are a few dozen pages of discussion of the health impacts of reclaimed water. I'd point you to 273 to 302 in the supplemental excerpts of record, the ones supplied by appellees. I'd point you to a couple pages within that particularly. SCR 275, which has to do with studies specifically having to do with ingesting reclaimed water, and then SCR 302 itself, the last in that sequence, which has to do with a study investigating snowmaking made from reclaimed water and the effect on any bacterial constituents of making snow from reclaimed water. So, you know, what this Court said and Lands Council and many other times since is, you know, all you are looking for is can you discern the path that the agency took to get to the result that it did. And here there is plenty of information that supplies that path and confirms the result. Okay. Thank you very much. Thank you. We'll hear again from Mr. Shank. There's a lot to cover in a short amount of time. But what the lower court said, and I'll quote, as plaintiffs admitted at oral argument the fact that Snow Bowl Improvement Project is almost complete is problematic for purposes of prejudice in the laches context. Our excerpts of record lines 20 to 22. She thought this was complete. She said, again, the near completion of the project coupled with the burden of litigation is sufficient to establish prejudice. That's at ER 25 to 26. That's an erroneous finding of a material fact, which constitutes an abuse of discretion. Construction is not almost complete. Laches is measured at the time the case is filed. What you're looking at here are costs that they've incurred after this case has been completed. The environmental scoping is something they would have done anyway. The cost of the prior litigation really has nothing to do with this case. With regard to the studies that they've cited, if you look at them, not one of those studies has anything to do with using reclaimed sewer water to make snow for recreational purposes. When they talk about ingestion, they're talking about reinjection into an aquifer. It's unrelated. The water is further purified and diluted with the water in the aquifer. The study she talked about, snowmaking, was looking at whether or not reclaimed water could be used to store effluent. They didn't even look at the issue of pharmaceuticals and personal care products. They really only looked at bacterial issues like coliform, fecal coliform. That's not really what the problem is here. What we've got here is Snowball and the federal government not going through the process that's required by NEPA. They don't do adequate analysis. In our briefs, we talk about one-fifth of this reasonably thorough discussion. One of the paragraphs says, well, we assume the ADEQ must have done some inspection or consideration of this, but there's nothing in the record that shows ADEQ did anything. Then they go on to talk about these studies, again, none of which consider recreational purposes. In fact, ADEQ regulations preclude using A or A-plus reclaimed sewer water for anything that could result in ingestion. Here, that's exactly what we've got. I'll wrap up. What they're proposing to do, substantively, is put a pipe on the end of the Rio de Flagues wastewater treatment plant, run this pipe up the mountain, make snow from 100 percent reclaimed sewer water that's not done anywhere else in the world, and then they're going to post signs that say, don't eat the snow. It's made from non-portable water. The analysis isn't appropriate, and lasses should not apply. If I may, I have 20 seconds. But the Apache survival cases, quickly, in Apache survival one, the court found undue delay because the challenge construction had permanently altered the character of a mountain, and harm repellent spheres become irreversible. That doesn't apply in this case. That's 21F3rd at 912, 913. Two, plaintiffs refused to participate in the administrative process. That doesn't apply in this case. Plaintiffs exhausted their administrative remedies, and the harm that plaintiffs asserted was isolated because it was only particular to that group. Again, that doesn't apply in this case. And I also noted that plaintiffs didn't move for injunctive relief until eight months after filing the complaint, long after construction was underway. Again, that doesn't apply in this case. The Apache survival cases are not analogous to the citizen procedure. Thank you very much. Thank you, Your Honor. Before we submit, I would like to say to the ladies and gentlemen of the audience, we thank you very much for your decorum. However this case comes out, I hope that you, in observing the conduct of the counsel, can take comfort in the fact that each side has excellent lawyers. They've done a great job. Somebody has to ultimately decide these questions. I hope it gives you some renewed faith in the process of the rule of law. All of us are appointed for life. We're not running for anything. We're just going to look at the facts. We're going to look at the law. We're going to do our level best to decide this in accordance with the facts and the law. But I compliment your lawyers. I compliment you for your involvement. And we're going to submit this case now, and we will decide the case as soon as we can. We're going to take a brief recess before we go to the last case because we have to get a counsel on the television. But again, thank you very much for coming, and we wish you well.
judges: Wallace, Noonan, Smith